# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| BRIAN JEFFREY SHOPEK, | Case No. 24-cv-4118 (LMP/EMB) |
| Plaintiff, |  |
| v. | **ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS** |
| CITY OF MINNEAPOLIS, GINA FILIGENZI, PAUL CAMERON, and DESTINY XIONG, |  |
| Defendants. |  |

Brian J. Shopek, pro se.

Kathryn Fodness and Mark S. Enslin, **Minneapolis City Attorney's Office, Minneapolis, MN**, for Defendants.

Plaintiff Brian Jeffrey Shopek brought this lawsuit against Defendants City of Minneapolis (the "City"), Gina Filigenzi, Paul Cameron, and Destiny Xiong,[1] asserting numerous causes of action under federal and Minnesota state law relating to his employment with the City. *See generally* ECF No. 49 (Amended Complaint). Defendants move to dismiss Shopek's amended complaint in its entirety pursuant to Rule 12(b)(b) of the Federal Rules of Civil Procedure. ECF No. 54.

For the reasons discussed below, Defendants' motion is granted in part as to Shopek's claims arising under federal law, and those claims are dismissed accordingly. The

---

[1] The Court refers to Filigenzi, Cameron, and Xiong, collectively, as the "Individual Defendants" in this Order.

Court denies as moot Defendants' motion as to Shopek's remaining state-law claims because the Court declines to exercise supplemental jurisdiction over them.

## FACTUAL BACKGROUND

For purposes of assessing Defendants' motion to dismiss, the Court accepts the factual allegations in Shopek's amended complaint as true. *Brown v. Conagra Brands, Inc.*, 131 F.4th 624, 627 (8th Cir. 2025).

## I.    Shopek's Employment with the City

Shopek has diagnoses of anxiety, depression, and attention-deficit/hyperactivity disorder ("ADHD").  ECF No. 49 ¶ 10.  He began working for the City in January 2019 as the Supervisor of IT Deskside Services and was responsible for supervising a team of eight-to-twelve employees, contractors, and interns providing IT support to City employees. *Id.* ¶¶ 11–14.  Around late 2019 or early 2020, Shopek began reporting to Filigenzi, who was the City's Director of ServiceDesk. *Id.* ¶ 17.  Cameron was the City's Chief Information Officer, *id.* ¶ 35, and Xiong was a City Human Resources ("HR") Manager and Americans with Disabilities Act ("ADA") Coordinator, *see* ECF No. 51-8 at 2.

After the COVID-19 pandemic began in early 2020, the City required its employees to work remotely, if possible.  ECF No. 49 ¶¶ 21–23.  However, Shopek and two members of his team volunteered to be "emergency responders" and continued to work mostly on site. *Id.* ¶¶ 23–28.  Shopek worked to ensure his health and safety and that of his team by, among other things, minimizing the number of people who were on site at any given time, ensuring proper sanitation of equipment, and reporting to his supervisors, including

Filigenzi, various "COVID safety violations that he saw," like people not adhering to masking requirements while on site. *Id.* ¶¶ 29–30.

In the second half of 2020, Filigenzi began requiring additional team members to report on site more frequently, and "[r]eports of people not following COVID protocols became a common issue." *Id.* ¶¶ 32, 34. In February 2021, Shopek "confronted a City police employee in an elevator" and "request[ed] they wear their mask properly," and the employee "reacted angrily." *Id.* ¶ 37. Shopek reported the incident to Filigenzi, but she "indicated little could be done about such issues." *Id.* Shopek was disturbed by the incident and "expressed that he no longer felt safe in the office and would not return until he felt secure." *Id.* Filigenzi acknowledged Shopek's concerns and allowed him to work remotely through the rest of 2021 "provided he continued to fulfill the essential functions of his job." *Id.* ¶¶ 37–38.

Nonetheless, Filigenzi eventually began encouraging Shopek to return to the office because she believed it was "poor leadership" for him to work remotely while the rest of the team he supervised worked on site. *Id.* For example, although Filigenzi stated in Shopek's performance review for 2021 that, although it was an otherwise "successful year" for Shopek, his remote work was "not optimal or sustainable" and that she believed his team would be "better served" if he returned to working on site. *Id.* ¶ 44; ECF No. 50-42 at 19. Shopek agreed that his remote-work arrangement was "not optimal currently" but expressed his belief that it could be made "more sustainable in the future." ECF No. 50-42 at 19. Separately, Filigenzi informed Shopek that he may face difficulties obtaining a

promotion because he worked remotely through most of 2021, and Shopek reported Filigenzi's comment to his HR representative. *Id.* ¶¶ 48–49.

Starting in January 2022, Shopek was expected to begin working a hybrid schedule which required him to be on site half the time. ECF No. 49 ¶ 45. Shopek's "anxiety remained elevated while working on-site," however, because of his concerns about contracting COVID-19 and his and his family's health. *Id.* ¶ 47. Shopek struggled with his anxiety and depression, which resulted in him working reduced hours on site and taking full days off. *Id.* ¶ 50. In March 2022, Shopek discussed his work arrangement with Filigenzi and formally requested a reduced on-site schedule to accommodate the school schedule of his girlfriend's daughter, to which Filigenzi agreed. *Id.* ¶ 51.

Later that month, Filigenzi informed Shopek that members of his team "continuously made jokes about his absence from the office," which Shopek told Filigenzi "added to his anxiety." *Id.* ¶ 54. Shopek began adjusting his work schedule to avoid being in the office on days when Filigenzi would be in the office. *Id.* ¶ 61. Shopek also met with Cameron several times over the following months to discuss Shopek's career development and concerns about working with Filigenzi, with whom he had developed "trust issues" because she "had ignored his concerns about COVID safety and had delayed a promised promotion to Manager for over a year." *Id.* ¶ 58. Cameron told Shopek that Filigenzi should not have promised him a promotion and "dismissed Shopek's worries about her behavior." *Id.*

Shopek met with Filigenzi on July 7, 2022. *Id.* ¶ 59. During that meeting, Filigenzi "yelled at Shopek" for discussing his concerns about her with Cameron and insisted that

Shopek should have addressed those issues with her. *Id.* Filigenzi again told Shopek that "there was a running joke about him not being in the office," ignoring Shopek's "concerns about the jokes and how they caused him massive anxiety." *Id.* ¶ 60. Filigenzi also informed Shopek that he would be required to work on site three days per week. *Id.* ¶ 59. Shopek and Filigenzi later agreed to coordinate schedules so they would not be in the office on the same days. This arrangement came about after an instance in which Filigenzi worked on site on a day that Shopek was also on site, which caused him to "le[ave] sick due to anxiety." *Id.* ¶¶ 61–62.

Between October 19 and December 19, 2022, Filigenzi took a personal leave of absence. *See id.* ¶ 63. Shopek was still required to work on site three days per week, but he "would work remotely, instead of taking sick leave," because he had "massive anxiety" about going into the office given his knowledge that "he was being made fun of when he wasn't around." *Id.*

After Filigenzi returned from her personal leave of absence, she held a meeting in early January 2023 with Shopek and two other City employees, including Jeff Gatesmith, a City HR representative. *Id.* ¶ 64. The purpose of the meeting was to discuss and determine a corrective action plan for Shopek for: (1) not meeting his requirement to be on site three days per week for fifteen of the twenty weeks between July 11 and December 23, 2022; (2) not working full days when he was scheduled to be on site; and (3) blocking time on his calendar with private appointments on days when he worked remotely. *See id.*; ECF No. 50-6. Shopek, Filigenzi, and Gatesmith met the following week to discuss the decision reached by Filigenzi and Gatesmith, which was memorialized in a Determination Letter.

*Id.* ¶ 66; *see* ECF No. 50-8. Shopek was required to: (1) adhere to the hybrid schedule established in July 2022; (2) refrain from blocking time on his calendar with private appointments without informing Filigenzi in advance; (3) work full eight-hour days; and (4) have an in-person meeting with Filigenzi once per week to review his team's performance and discuss any issues he had or support he may need. ECF No. 50-8. Shopek expressed that the requirement to meet with Filigenzi in person "heightened his anxiety," but Gatesmith responded that "the meetings would be beneficial." ECF No. 49 ¶ 66.

Around mid-to-late January 2023, Shopek submitted a letter requesting accommodations for his anxiety and ADHD. *See id.* ¶¶ 69, 71. Shopek requested: (1) a fully remote work schedule; (2) that all meetings he was required to attend, including his meetings with Filigenzi, be virtual rather than in person; (3) that his virtual meetings be recorded or transcribed so he could track any tasks assigned to him; and (4) that he be permitted to block time on his calendar to work on tasks or projects. *Id.* ¶ 70; *see* ECF No. 51-4. Shopek later submitted a form completed by his medical provider, in which the medical provider recommended allowing Shopek to block two one-hour periods each week to focus on his work without interruption and to work remotely full time through April 2023. ECF No. 49 ¶ 71; ECF No. 51-5.

Filigenzi "became hostile, overly critical, demanding, and inflexible" immediately after Shopek submitted his accommodation request. ECF No. 49 ¶ 72. Filigenzi then met with Shopek in early February 2023. *Id.* ¶ 73. Filigenzi denied Shopek's request for a fully remote work arrangement and reiterated the expectation that Shopek adhere to the previously established hybrid work arrangement. *See* ECF No. 51-6 at 1–2. She also

denied Shopek's request that all his meetings be recorded or transcribed but agreed to list any tasks assigned to Shopek in a shared document. *See id.* at 2. Filigenzi agreed that Shopek's meetings, including his weekly meetings with her, could be conducted virtually, with the caveats that: (1) if both Shopek and Filigenzi were in the office, she may require that the meeting be in person; and (2) if he was required to attend any other meeting for which there was not a virtual option, he would be required to attend in person. *See id.* at 1. Finally, Filigenzi agreed to allow Shopek to block time on his calendar to focus on his work tasks so long as those appointments were fully visible to Filigenzi and Shopek's team— that is, not marked "private" such that the details were hidden—and he remained available to support his team as needed. *See id.* at 2.

Dissatisfied with Filigenzi's response, Shopek sent an email to several City employees, including Filigenzi, Xiong, and Cameron, to appeal the decision on February 15, 2023. ECF No. 49 ¶ 74; *see* ECF No. 50-9. Shopek later sent a second email detailing his concerns with the accommodations Filigenzi offered and proposing alternatives. ECF No. 49 ¶ 75; *see* ECF No. 50-10. On March 9, 2023, Shopek met with Filigenzi, Cameron, Xiong, and Gatesmith to discuss his requested accommodations. ECF No. 49 ¶ 77. Xiong sent a letter to Shopek the next day summarizing the details of that meeting and the City's decision as to his request. *Id.*; *see* ECF No. 51-8. The City's decision largely mirrored Filigenzi's earlier communication to Shopek, but Shopek was specifically permitted to schedule "a regular 1-hour dedicated time on Tuesday and Thursday specific for projects and focused work." ECF No. 51-8 at 1–2. In addition, in April 2023, Gatesmith and Shopek's medical provider submitted information to the City's

insurance provider for Shopek to be evaluated for eligibility for intermittent leave under the Family and Medical Leave Act ("FMLA"), which was ultimately approved. *See* ECF No. 49 ¶¶ 81–82; *see* ECF No. 51-17

Around the same time, Shopek appealed the City's March 2023 decision regarding his accommodations request to Nikki Odom, the City's Chief HR Officer, ECF No. 49 ¶¶ 78, 80, and on May 31, 2023, Odom sent a final determination upholding the City's decision, *id.* ¶ 101; ECF No. 50-21. Odom stated that the City "only provides *reasonable* accommodations, and not all proposed accommodations are reasonable," and explained that Shopek's position "requires, among other things, for [Shopek] to manage a team of direct reports who are onsite" and was "not designed to be performed 100% remotely." ECF No. 50-21 at 1 (emphasis in original). She also explained that prohibiting Filigenzi from working on site when Shopek would also be on site was not a reasonable accommodation. *Id.* at 1–2. Odom added that she had "asked the HR team to continue brainstorming alternative accommodations." *Id.* at 2.

Filigenzi began working on site more regularly around May 2023, including on days when Shopek was working on site. *See id.* ¶¶ 87, 91–93. Shopek began using FMLA leave on days when Filigenzi came into the office "due to lack of effective accommodations." *See, e.g.*, *id.* ¶¶ 87, 91, 93, 97–98. Shopek still worked on days when he took FMLA leave "in order to meet [Filigenzi's] timelines" for his work. *Id.* ¶ 92. This pattern continued over the subsequent weeks and months: Filigenzi would come into the office on days when Shopek was also in the office, and Shopek would use FMLA leave to avoid interacting with Filigenzi. *See, e.g.*, *id.* ¶¶ 105, 110, 113, 116, 118, 123, 130, 133.

Xiong sent an email to Shopek on May 30, 2023, requesting updated information from Shopek's medical provider so she could determine whether Shopek's accommodations should be extended. *See* ECF No. 50-23 at 2–3. Shopek responded on June 9, 2023, stating that he had retained legal counsel and that he had "concerns regarding the request," and he did not provide the requested medical documentation. *Id.* at 2. On or around June 16, 2023, Shopek filed a charge of discrimination against the City through the City's Civil Rights Division, and mediation was scheduled for July 2023.[2] ECF No. 49 ¶ 114. Citing the upcoming mediation, Shopek followed up with Xiong on June 30, 2023, to indicate that "he would not be providing updated provider documentation" at that time and directed her to "contact his lawyer for any questions." *Id.* ¶ 119.

Xiong did not contact Shopek's lawyer, and on July 6, 2023, she sent a letter to Shopek informing him that his accommodations would end "effective immediately" because the medical documentation he previously submitted "only contained work restrictions through the end of April 2023," and he was "refusing to participate in the interactive process." ECF No. 51-11. On July 18, 2023, Shopek provided the medical information Xiong requested. *Id.* ¶ 131. Shopek's medical provider again recommended that Shopek be permitted to work remotely full time for three months, ECF No. 51-12 at 5, but Xiong explained that the City was "unable to accommodate that request," ECF No. 50-25 at 1. Xiong noted that she and Shopek had "previously discussed that a

---

[2]      Shopek's charge of discrimination is discussed in greater detail in Part II of the Factual Background.

continuous leave of absence [was] a possibility" to accommodate Shopek's anxiety and expressed her intention "to schedule a meeting to explore alternative accommodations." *Id.* at 1–2.

On July 28, 2023, Shopek was working on site, and Filigenzi arrived later that morning. ECF No. 49 ¶ 134. Shortly after arriving, Filigenzi spoke with someone near Shopek and then "waved at Shopek." *Id.* Shopek became "distraught and started to hyperventilate," then "gathered his belongings and left." *Id.* That afternoon, Shopek joined a remote meeting with Xiong, Filigenzi, Cameron, and Gatesmith to discuss accommodations. *Id.* ¶ 135. The meeting was unproductive, and Xiong asked Shopek to send accommodation ideas to her so that she could review them with his supervisors. *See id.* ¶ 136. When Filigenzi and Shopek were both in the office a few days later, Filigenzi "walked up behind him, where he could not see her, and began to talk to him," which caused Shopek to "hyperventilate." *Id.* ¶ 137. Shopek "tried to calm himself down, but was unable to," so he again "packed up his belongings and left" early. *Id.*

On August 1, 2023, Shopek met with Cameron and Xiong, who determined Shopek should be placed on a continuous leave of absence for the remainder of his FMLA entitlement because he was "not presently able to perform the essential functions of [his] position," specifically to "be on-site to plan, organize, coordinate and maintain effective on-site deskside support services for the City." ECF No. 51-13 at 1; *see* ECF No. 49 ¶ 138. Xiong again explained that allowing Shopek to work remotely full time was not a reasonable accommodation. ECF No. 51-13 at 1.

Shopek submitted updated medical documentation on August 3, 2023, indicating that he could work on site full time provided that he could use "alternative forms of communication" and could have "a designated quiet space for him to work."  ECF No. 49 ¶ 140; *see* ECF No. 51-14.  On August 8, 2023, Xiong informed Shopek that he could return to work but indicated that he was not expected to come on site because the City was still exploring options for workspace accommodations.  ECF No. 49 ¶ 142; *see* ECF No. 51-15 at 1.  Shopek met virtually with Xiong and Cameron the next day to discuss potential options and to clarify his request for "alternative means of communication."  ECF No. 49 ¶ 144.  Xiong also informed Shopek that she would be contacting his medical provider for additional information.  *Id.*

Cameron scheduled an on-site meeting with Shopek on August 10, 2023, but Shopek, citing his "anxiety when being in person with Filigenzi," refused to attend a meeting in person unless either his attorney or girlfriend could attend with him or he could "attend[] from a different conference room than Filigenzi, and a few others."  *Id.* ¶ 145. Cameron declined Shopek's requests, and Shopek again took FMLA leave.  *Id.*  Cameron eventually agreed to hold the meeting virtually on August 16, 2023, but the meeting was unproductive.  *Id.* ¶ 146.  Cameron again recommended having an in-person meeting, believing it "would be better for moving past issues," but Shopek again refused because of "the anxiety that [it] would cause" him.  *Id.* ¶ 151.  Rather than agreeing to an in-person meeting with Cameron, Shopek took FMLA leave from August 21, 2023, through September 15, 2023.  *See id.* ¶¶ 152, 154–55, 157–59.

On September 12, 2023, Shopek submitted updated information from his medical provider along with a new request for accommodations to Xiong, seeking essentially the same accommodations he had previously requested, clarifying that the "quiet workspace" he requested should be a full-time accommodation, and asking for "additional intermittent leave." *Id.* ¶ 161; *see* ECF Nos. 51-17, 51-18. Xiong responded on September 15, 2023, telling Shopek that he could use a conference room for one hour each day to accommodate his need for a quiet workspace but that his assigned office space could not be moved because there were no available spaces he could use full time. *Id.* ¶ 162; *see* ECF No. 51-19 at 1. Xiong also denied Shopek's request for additional FMLA leave, noting that Shopek had exhausted his FMLA entitlement. ECF No. 51-19 at 2. As such, Xiong informed Shopek that he was expected to return from his leave of absence and report to work on site on September 18, 2023. *Id.* at 3.

Shopek did not return to work as instructed and instead "called out sick due to not having effective accommodations in place." ECF No. 49 ¶¶ 165–66. The next day, the City sent a letter to Shopek which "serve[d] as official notice of [his] separation from employment with the City" as of September 18, 2023. ECF No. 50-39. The City deemed Shopek's "separation from employment" to be a resignation pursuant to the City's Civil Service Rule 13.06, which states: "Failure of an employee to return to their position on the date of expiration of suspension or leave of absence will be considered a resignation." *Id.*; *see also* ECF No. 50-46.

Shopek requested a copy of his personnel file and the "truthful reason for separation." *Id.* ¶ 168. He received a copy of his personnel file, but he found that it did

not include the determination letter relating to his separation from employment or "multiple" performance reviews. *Id.* Shopek then attempted to appeal the separation, but he was informed that because he was deemed to have resigned, he could not appeal the decision. *Id.* ¶ 169. Shopek contacted Gatesmith and a City attorney to request that his personnel file be updated to reflect that he was terminated[3] and to include the missing determination letter and performance reviews. *Id.* ¶¶ 178–79. Odom later responded to Shopek with information about requesting a copy of his personnel file but "would not speak on updating" it. *Id.* ¶ 179.

## II.    Shopek's Charge of Discrimination

Shopek filed a charge of discrimination ("Charge") against the City through the Minneapolis Department of Civil Rights ("MDCR") on or around June 16, 2023, *id.* ¶ 114, asserting that the City "discriminated against [him] based on [his] disability, failed to accommodate [his] disability, and retaliated against [him]," ECF No. 21-2 at 1. He later

---

[3]    Whether Shopek resigned or the City terminated his employment was the subject of a Minnesota administrative dispute to determine Shopek's eligibility for unemployment benefits. *See, e.g.*, ECF No. 49 ¶¶ 171–77. Under Minnesota law, "[n]o findings of fact or decision or order issued by an unemployment law judge may be held conclusive or binding or used as evidence in any separate or subsequent action in any other forum, be it contractual, administrative, or judicial, . . . regardless of whether the action involves the same or related parties or involves the same facts." Minn. Stat. § 268.105, subd. 5a. Further, testimony obtained at an unemployment benefits eligibility hearing "may not be used or considered for any purpose" in any civil proceeding "except by a local, state, or federal human rights agency with enforcement powers." *Id.*, subd. 5(b). Therefore, the Court will not consider Shopek's allegations that discuss or rely upon any testimony offered, or factual or legal determinations made, in those proceedings.

filed an amended charge of discrimination ("Amended Charge") on October 26, 2023, after his separation from employment in September 2023.  ECF No. 21-3.

After investigating Shopek's claims, the MDCR concluded that there was no probable cause to credit the allegations in Shopek's Charge and Amended Charge.  ECF No. 21-4 at 25; *see* ECF No. 49 ¶ 183.  Shopek appealed the MDCR's determination on September 17, 2024, and an independent review panel affirmed the finding of no probable cause the next day.  ECF No. 58-1 at 2–3.  Shopek received notice of the panel's decision on September 19, 2024, and was issued a right-to-sue letter.  ECF No. 49 ¶ 183.

Shopek later learned he could appeal the MDCR's decision to the United States Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 184.  Shopek contacted EEOC representatives to inquire about a potential appeal and was informed that "his appeal was unable to be put forward due to timing" but that the EEOC would issue an updated right-to-sue letter.  *Id.* ¶ 188.  The EEOC issued that updated right-to-sue letter on December 4, 2024, indicating that if Shopek intended to sue the City based on the allegations in his Charge and Amended Charge, he was required to file suit within ninety days of receiving the letter.  *See id.* ¶ 189; *see* ECF No. 51-1.

## III.    Shopek's Claims

Shopek filed his initial complaint in this matter on November 4, 2024.  ECF No. 1. In response to a motion to dismiss filed by Defendants, ECF No. 17, he then filed the operative amended complaint on May 27, 2025, ECF No. 49.  In total, Shopek asserts twelve causes of action against the City: disability discrimination (Count I), retaliation (Count II), failure to accommodate (Count III), and improper medical inquiries (Count IV),

all in violation of the ADA, *id.* ¶¶ 192–251; disability discrimination (Count V) and retaliation (Count VI) in violation of the Minnesota Human Rights Act ("MHRA"), *id.* ¶¶ 258–78; wrongful discharge under Minnesota law (Count VII), *id.* ¶¶ 279–82; violation of Shopek's Fourteenth Amendment right to due process under 42 U.S.C. § 1983 (Count VIII), *id.* ¶¶ 283–89; FMLA interference (Count IX) and retaliation (Count X), *id.* ¶¶ 291–301; intentional infliction of emotional distress ("IIED") under Minnesota common law (Count XI), *id.* ¶¶ 302–10; and violation of the Minnesota Government Data Practices Act ("MGDPA") (Count XII), *id.* ¶ 311.

Defendants move to dismiss Shopek's amended complaint in its entirety for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## ANALYSIS

When considering a Rule 12(b)(6) motion, a court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the nonmoving party's favor. *Brown v. Conagra Brands, Inc.*, 131 F.4th 624, 627 (8th Cir. 2025). To overcome a motion to dismiss under Rule 12(b)(6), the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although "pro se complaints are to be construed liberally, they still must allege sufficient facts to support the claims advanced." *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (citation modified).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Brokken v. Hennepin County*, 140 F.4th 445, 450 (8th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Mere recitations of the elements of a cause of action are insufficient to state a plausible claim for relief, and a court need not accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. "While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion," courts also may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, . . . items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (citation omitted).

Having carefully reviewed Shopek's amended complaint, the materials embraced by the complaint, and the parties' arguments, the Court concludes that Shopek has not stated a plausible claim for relief.

## I.    ADA Claims

The ADA prohibits employers from discriminating against qualified employees on the basis of disability. 42 U.S.C. § 12112(a). This prohibition extends to conduct such as failing to provide reasonable accommodations for a qualified employee with known physical or mental limitations, *id.* § 12112(b)(5)(A); making inquiries of an employee as to the nature or severity of his disability that are unrelated to the employee's job duties, *id.* § 12112(d)(4); and retaliating against an employee for opposing the employer's discriminatory practices, *id.* § 12203(a).

For the reasons discussed below, the Court finds that Shopek has not stated plausible claims under the ADA.

### A.    Individual Liability

Defendants first argue that Shopek's claims against the Individual Defendants fail because the ADA only authorizes civil actions against an employer, not individual agents of an employer.  *See* ECF No. 56 at 12–14.  Shopek concedes that the ADA does not impose liability on individuals separate from employers, but he urges the Court to construe his ADA claims as being brought against the Individual Defendants in their official capacities. ECF No. 61 at 1–2.

Shopek's argument is unavailing because claims against municipal employees in their official capacities "generally represent only another way of pleading an action against an entity of which [the employee] is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citation omitted); *see Hall v. Higgins*, 77 F.4th 1171, 1178 (8th Cir. 2023) (collecting cases).  As such, construing Shopek's ADA claims as being raised against the Individual Defendants in their official capacities would make them duplicative of Shopek's claims against the City.  *See Graham*, 473 U.S. at 165–66.  Accordingly, Shopek's ADA claims against the Individual Defendants are dismissed.

### B.    Administrative Exhaustion

Defendants next argue that Shopek's ADA claims largely fail as a matter of law because Shopek did not exhaust his administrative remedies relating to those claims prior to filing suit.  *See* ECF No. 56 at 15–16.  The Court agrees in part.

Under the ADA, a plaintiff must exhaust his administrative remedies by filing a charge of discrimination with the EEOC before filing suit in court. *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944 (8th Cir. 2021); *see Brown v. Ameriprise Fin. Servs., Inc.*, 707 F. Supp. 2d 971, 975 (D. Minn. 2010) ("Because the agency cannot investigate a claim about which it has not been notified, an administratively unalleged claim will be deemed unexhausted, meaning it cannot be asserted in a subsequent lawsuit."). A charge of discrimination is "part of the public record and may be considered on a motion to dismiss." *Blakley v. Schlumberger Tech. Corp.*, 648 F.3d 921, 931 (8th Cir. 2011). "'Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice' that must be individually addressed before the EEOC." *Sellers v. Deere & Co.*, 791 F.3d 938, 943 (8th Cir. 2015) (quoting *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012) (per curiam)). Courts "construe administrative charges liberally" and "will consider those claims specifically raised and those that are 'like or reasonably related to the administrative charges that were timely brought.'" *Weatherly*, 994 F.3d at 944 (quoting *Wedow v. City of Kansas City*, 442 F.3d 661, 672 (8th Cir. 2006)). But "there is a difference between liberally reading a claim which lacks specificity, and inventing, [out of nothing], a claim which simply was not made." *Sellers*, 791 F.3d at 943 (citation omitted).

Defendants contend that Shopek did not raise any allegations in the Charge or Amended Charge relating to his allegations of disparate treatment (Count I) and improper medical inquiries (Count IV) and therefore did not exhaust his administrative remedies as to those claims. ECF No. 56 at 15–16. Defendants assert that Shopek instead "only

complained that he was required to work on site three days per week and about his separation" in his Charge and Amended Charge and that the factual basis of his discrimination claims here must be limited to those complaints. *Id.*

The Court agrees that Shopek did not exhaust his administrative remedies as to his claims for improper medical inquiries. Even liberally construed, Shopek made no allegations in his Charge and Amended Charge relating to any inquiries, improper or otherwise, made by Defendants as to Shopek's medical condition. *See generally* ECF Nos. 21-2, 21-3. As such, Shopek's claim for improper medical inquiries under the ADA (Count IV) must be dismissed. *See Weatherly*, 994 F.3d at 946.

As for the remainder of Shopek's ADA claims, including his allegations of disparate treatment, the Court concludes that Shopek exhausted his administrative remedies. In both his Charge and Amended Charge, Shopek alleged that Defendants "discriminated against [him] based on [his] disability, failed to accommodate [his] disability, and retaliated against [him]." ECF No. 21-2 at 1; ECF No. 21-3 at 1. In support of those allegations, Shopek identified specific instances of what he believes were discriminatory and retaliatory acts and discusses the various accommodation requests he made, which Defendants denied in part. *See generally* ECF Nos. 21-2, 21-3. Specific to Shopek's allegations of disparate treatment here, and contrary to Defendants' framing of Shopek's allegations in the Charge and Amended Charge, Shopek alleged that he was "required to come in for in-person meetings when others [were] allowed to participate remotely." ECF No. 21-2 at 1.

Defendants urge the Court to limit the scope of Shopek's claims here only to the specific allegations he raised in the Charge and Amended Charge, but courts do not require

that subsequently filed lawsuits "mirror the administrative charges." *Henke v. Allina Health Sys.*, 698 F. Supp. 2d 1115, 1123 (D. Minn. 2010) (quoting *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004)); *see Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 886 (8th Cir. 1998) ("[T]he scope of the subsequent action is not necessarily limited to the specific allegations in the charge."). Rather, the scope of a subsequent judicial action is "no broader than" the scope of the administrative investigation that "could reasonably be expected to grow out of the charge." *Weatherly*, 994 F.3d at 945 (quoting *Wedow*, 442 F.3d at 674). Further, the Eighth Circuit has instructed courts not to use the administrative procedures of federal employment discrimination statutes "as a trap for unwary *pro se* civil-rights plaintiffs" and should, "when appropriate, construe civil-rights and discrimination claims charitably." *Duncan*, 371 F.3d at 1025 (citation omitted).

The Court concludes that Shopek's claims—other than his claim for improper medical inquiries, as discussed above—"could reasonably be expected to grow out of" the allegations he made in the Charge and Amended Charge. As it relates specifically to Shopek's allegations of disparate treatment, it is not much of a stretch to conclude that Shopek inferred discrimination from his perception of being treated differently than his colleagues because he was "required to come in for in-person meetings when others [were] allowed to participate remotely," as he alleged in the Charge. ECF No. 21-2 at 1. As such, the Court will not limit the scope of Shopek's claims only to the specific allegations he made in the Charge and Amended Charge.

To summarize, the Court finds that Shopek did not exhaust his administrative remedies relating to his claim for improper medical inquiries under the ADA (Count IV).

As a result, Shopek cannot maintain that claim here, so that claim is dismissed.  *See* *Weatherly*, 994 F.3d at 946.  However, the Court finds that Shopek exhausted his administrative remedies relating to his claims of disability discrimination, failure to accommodate, and retaliation under the ADA and turns to whether Shopek has stated plausible claims.

### C.    Disability Discrimination (Count I)

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that he: (1) has a disability within the meaning of the ADA; (2) was a qualified individual under the ADA; and (3) suffered an adverse employment action because of his disability.  *Goosen v. Minn. Dep't of Transp.*, 105 F.4th 1034, 1040 (8th Cir. 2024).  Although a plaintiff does not necessarily need to allege "enough facts to establish a prima facie case" at the pleadings stage, "the elements of a prima facie case remain relevant" and "may be used as a prism to shed light upon the plausibility of the claim." *Ingram v. Ark. Dep't of Corr.*, 91 F.4th 924, 927 (8th Cir. 2024) (citation omitted).

Defendants do not dispute that Shopek has pleaded a disability.  They argue instead, in effect, that Shopek has not plausibly alleged that he was a qualified individual because the accommodations he requested were not reasonable as a matter of law.[4]  ECF No. 56 at 22–25.  To show that he was a qualified individual under the ADA, Shopek must

---

[4]    Defendants also argue that Shopek's disability-discrimination claim fails because he has not sufficiently identified an adverse employment action he suffered because of his disability.  *See* ECF No. 56 at 16–17.  The Court need not address that argument here because, as explained, the Court concludes that Shopek has not plausibly alleged he was a qualified individual.

demonstrate that he: (1) possessed the "skill, education, experience, and training" required of his position; and (2) could perform the essential functions of his job, "with or without reasonable accommodation." *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022). There is no dispute that Shopek had the skill, education, experience, and training for his position, and Shopek himself alleges that he could not perform the essential functions of his job *without* reasonable accommodation. *See, e.g.*, ECF No. 49 ¶ 165 ("Shopek called out sick due to not having effective accommodations in place . . . ."). The question, then, is whether Shopek's requested accommodations were reasonable and would have enabled him to perform the essential functions of his job.

"Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds," and an employer's judgment as to what constitutes an essential function is "highly probative." *Goosen*, 105 F.4th at 1040 (citation omitted). There is "no precise test" to determine whether an accommodation is reasonable, but "an accommodation is unreasonable if it requires the employer to eliminate an essential function of the job." *EEOC v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007).

Shopek variously requested a fully remote work schedule, a fully enclosed workspace separate from his team, and that all his meetings have a virtual attendance option, suggesting that the only accommodations that he deemed reasonable were those that would allow him to avoid interacting with Filigenzi, especially in person. *See, e.g.*, ECF No. 49 ¶¶ 87, 91, 93, 95, 98, 105, 109–10, 112–13, 116–18, 120, 122–23, 130, 133. But these accommodations also would have required the City to eliminate an essential

function of his job.  Odom's May 2023 letter denying Shopek's first appeal of the City's decision regarding his accommodation requests states that Shopek was "responsible for the supervision, oversight, and day-to-day operations of the Deskside support division."  ECF No. 50-21 at 1.  Odom explained that Shopek's position required, "among other things, for [him] to manage a team of direct reports who are *onsite*," and that "[t]he ability to supervise, provide guidance for, and support [his] team members and their work *in-person* [was] an essential function of [his] job."  *Id.* (emphasis added).  Shopek does not appear to dispute that supervising his team on site and in person was an essential function of his job, but his requested accommodations would have effectively relieved Shopek from fulfilling it.  *See* ECF No. 50-21.  As such, the requested accommodations were not reasonable.[5]  *See Convergys*, 491 F.3d at 796;  *Freeman v. City of Cheyenne*, 660 F. Supp. 3d 1155, 1159–60, 1164–65 (D. Wyo. 2023) (holding an employee's request for a fully remote work schedule unreasonable as a matter of law where the essential functions of the employee's job "require[d] physical attendance," "providing staff assistance," and "attending and participating in professional group meetings," even though the employee was diagnosed

---

[5]    The fact that the City previously accommodated Shopek in the manner he preferred does not, by itself, show the accommodations were reasonable.  *See Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 943 (8th Cir. 2018) (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995)) ("If an employer 'bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'"); *Scruggs v. Pulaski County*, 817 F.3d 1087, 1093 (8th Cir. 2016) ("An employer is not required to provide the specific accommodation requested or preferred by an employee.").

with anxiety and depression and her supervisor "was abusive and created a stressful work environment").

Shopek also requested additional FMLA leave as a remedy to the City's refusal to grant his preferred accommodations. ECF No. 49 ¶ 161; ECF No. 50-35 at 1. But this too is not a reasonable accommodation. *See Scruggs v. Pulaski County*, 817 F.3d 1087, 1093 (8th Cir. 2016) (concluding an employee's request for "an additional week to obtain an FMLA certification" after exhausting her FMLA entitlement was "not a reasonable accommodation" because the FMLA "does not entitle an employee to extended leave" once their statutory twelve-week FMLA entitlement "has been used"); *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d at 546–47 (8th Cir. 2021) (quoting *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 n.4 (8th Cir. 2001)) ("'[I]ntermittent FMLA leave does not excuse an employee from the essential functions of the job,' such as the need for regular and reliable attendance." (alteration in original)).

At bottom, Shopek's "suggested accommodations were not ones that would enable [him] to perform the essential functions" of his position but rather "would relieve [him] of those functions." *Faulkner v. Douglas County*, 906 F.3d 728, 734 (8th Cir. 2018). Shopek therefore has not plausibly alleged he was a qualified employee because he could not fulfill the essential functions of his job without reasonable accommodation, and the accommodations he requested were not reasonable. *See id.*; *Freeman*, 660 F. Supp. 3d at 1164–65; *Convergys*, 491 F.3d at 796; *Scruggs*, 817 F.3d at 1093; *Evans*, 996 F.3d at 546–47. Accordingly, Shopek's disability-discrimination claim is dismissed.

### D.    Retaliation (Count II)

To state a claim for retaliation under the ADA, a plaintiff must allege: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the two.  *Evans*, 996 F.3d at 548.  Shopek has not stated a plausible claim for ADA retaliation.

Shopek primarily cites his various complaints about Filigenzi to HR beginning in January 2022 as the alleged protected activity in which he engaged, and he asserts that the City later retaliated against him by "removing [his] accommodations, forcing him on an unpaid leave, and terminating him."  *See* ECF No. 49 ¶¶ 219–25.  Even assuming the activities Shopek cites were statutorily protected under the ADA, his allegations do not demonstrate a "but-for causal connection between [his] assertion of [his] ADA rights and an adverse action by" the City.  *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 924 (8th Cir. 2018) (citation omitted).

Shopek's pleadings and exhibits show that the City revoked the accommodations that were implemented for Shopek in February 2023 because the medical documentation he had previously submitted "only contained work restrictions through the end of April 2023."  ECF No. 51-11.  The City asked Shopek to provide updated medical documentation to assess whether the accommodations were still necessary, but Shopek refused to do so.  *See id.*; ECF No. 49 ¶¶ 111, 119.  After Shopek eventually provided the requested medical documentation, *see* ECF No. 51-18, the City reevaluated his accommodation requests and, in fact, granted some of them based on the information provided, *see* ECF No. 51-19.  Further, the City placed Shopek on continuous FMLA leave

in August 2023 because he was not "able to perform the essential functions of [his] position"—namely, reporting to work and managing his team on site and in person—and had expressly communicated to Shopek on several occasions that his request for full-time remote work was "not a reasonable accommodation." ECF No. 51-13 at 1; *cf. Scruggs*, 817 F.3d at 1095 ("Because [employee] was unable to perform an essential function of her job, [employer] did not violate FMLA by placing her on consecutive rather than intermittent leave.").

Moreover, Shopek was not terminated; he effectively resigned his position, consistent with the City's Civil Service Rule 13.06. That is because Shopek did not "return to [his] position" upon expiration of his leave of absence. ECF No. 50-46. Shopek does not allege, to the extent it matters, that he was unaware of Rule 13.06, and he acknowledges that he had exhausted his FMLA entitlement as of the date he was instructed to return to work. *See* ECF No. 49 ¶ 242. Ultimately, Shopek's decision not to return to work on site as instructed was his choice, and it does not make the City's enforcement of its Civil Service Rules an adverse action sufficient to support a claim of retaliation under the ADA.

Even if the City had affirmatively terminated Shopek's employment, however, Shopek's pleadings still would not support an ADA retaliation claim because he has not alleged any facts that plausibly establish causation. Shopek's pleadings show that the City worked with him to accommodate his disability beginning as early as February 2021. *See* ECF No. 49 ¶ 37. After Shopek raised complaints to HR about Filigenzi, the City offered additional accommodations, including intermittent FMLA leave. *Id.* ¶ 81; *see* ECF No. 51-8. And after placing Shopek on a continuous leave of absence because he was

unable to fulfill the essential functions of his job, ECF No. 51-13, the City continued trying to find mutually agreeable accommodations that would enable Shopek to return to work, *see generally* ECF No. 50-32. It was not until Shopek refused to return to work after exhausting his FMLA entitlement that the City concluded Shopek had resigned his position pursuant to Civil Service Rule 13.06. *See* ECF No. 49 ¶¶ 165–67. That does not constitute retaliation under the ADA. *See Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1184–85 (8th Cir. 2019) (concluding an employer did not retaliate against an employee in violation of the ADA where the employer "work[ed] with" the employee after he "complained of discrimination" and "did not terminate his employment until he continuously rejected the [employer's] proposed accommodations and did not return to work").

For these reasons, the Court finds that Shopek has not plausibly alleged an ADA retaliation claim. Accordingly, his claim is dismissed.

### E.    Failure To Accommodate (Count III)

To ultimately prevail on a failure-to-accommodate claim under the ADA, a plaintiff must establish "both a prima facie case of discrimination based on disability and a failure to accommodate it." *Hopman v. Union Pac. R.R.*, 68 F.4th 394, 396 (8th Cir. 2023) (citation omitted). As discussed above, the Court finds that Shopek has not plausibly alleged an ADA disability-discrimination claim, so he necessarily cannot establish a failure-to-accommodate claim. *See id.* Therefore, Shopek's failure-to-accommodate claim is dismissed.

## II.     Section 1983 Claims (Count VIII)

Section 1983 provides a civil cause of action to an individual who is deprived "of any rights, privileges, or immunities secured by the Constitution and laws" if such deprivation is committed "under color of any statute, ordinance, [or] regulation." 42 U.S.C. § 1983.  Shopek alleges that Defendants violated his right to procedural due process under the Fourteenth Amendment by failing to provide a "constitutionally adequate process" for review of his separation from employment because it was deemed a resignation under the City's Civil Service Rules.  ECF No. 49 ¶¶ 283–89.

As an initial matter, Shopek does not specify whether he is suing the Individual Defendants in their individual or official capacities.  The Court observes, however, that Defendants appear to presume Shopek's claims are raised against the Individual Defendants in their individual capacities.  *See* ECF No. 56 at 29–30.  The Court therefore construes Shopek's Section 1983 claims against the Individual Defendants to be raised against them in their individual capacities.  *See S.A.A. v. Geisler*, 127 F.4th 1133, 1139–40 (8th Cir. 2025) (citation omitted) (stating that when a plaintiff asserts Section 1983 claims against public officials without specifying whether the claims are raised against the officials in their individual or official capacities, the "fundamental question" is whether the officials are "on notice" that they are being sued in their individual capacities).  And to the extent Shopek intends to raise his Section 1983 claims against the Individual Defendants in their official capacities, those claims are treated as claims against the City itself.  *Ness v. City of Bloomington*, 11 F.4th 914, 922 (8th Cir. 2021) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).

Regardless, Shopek does not plausibly allege a Section 1983 claim against the Individual Defendants or the City.

### A.    Claims Against the Individual Defendants

To state an individual-capacity claim under Section 1983, Shopek must allege facts showing that each Individual Defendant, "through [his or her] own individual actions, has violated the Constitution." *Z.J. ex rel. Jones v. Kan. City Bd. of Police Comm'rs*, 931 F.3d 672, 687–88 (8th Cir. 2019) (alteration in original) (quoting *Iqbal*, 556 U.S. at 676). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Id.* (citation omitted).

Shopek has not stated a plausible Section 1983 claim against any of the Individual Defendants. His claim is premised on alleged violations of his right to procedural due process under the Fourteenth Amendment—primarily, the fact that he was unable to appeal his separation from employment because it was deemed a resignation under Civil Service Rule 13.06. *See* ECF No. 49 ¶¶ 284–89. But Shopek does not plead any facts that show any of the Individual Defendants "failed to provide a constitutionally adequate process for Independent Review" of his resignation. *Id.* ¶ 285. Instead, he cites his discussions with other City officials in the Civil Service Commission and Bureau of Mediation Services who informed him that his resignation could not be reviewed under the City's Civil Service Rules. *See id.* ¶¶ 286–87. Shopek does not assert any claims against any of those officials, and he alleges no facts from which the Court can infer that the Individual Defendants had anything to do with the determination that Shopek could not appeal his resignation.

Shopek also asserts that the Individual Defendants "categorized" his separation from employment as a "resignation" so they could "ensure he was not able to appeal their decision." *Id.* ¶ 289. But this is a speculative and conclusory allegation that lacks any factual support and raises only a "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Regardless, Civil Service Rule 13.06 makes clear that an employee's refusal to return to his position after a leave of absence "*will be* considered a resignation." ECF No. 50-46 (emphasis added). Shopek admits that he did not return to his position upon exhausting his FMLA entitlement. ECF No. 49 ¶ 165. His allegations suggest only that the Individual Defendants were applying Rule 13.06 as written and, therefore, do not permit a reasonable inference that they were motivated by some unlawful purpose.

Because Shopek has not plausibly alleged that any of the Individual Defendants violated his constitutional rights, his Section 1983 claims against them are dismissed. *See Z.J.*, 931 F.3d at 687.

### B.    Claims Against the City

To establish that a municipality, such as the City, is liable under Section 1983, Shopek first must show that the alleged deprivation of his civil rights was "committed pursuant to an official custom, policy, or practice." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citing *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978)). Shopek appears to allege that the alleged due process violation by the City relates to the application of an official City policy, namely Civil Service Rule 13.06. *See* ECF No. 49 ¶ 289. "[T]here can be no § 1983" liability for a municipality, however, "absent a constitutional violation" by a municipal employee. *Torgerson v. Roberts County*, 139 F.4th

638, 646 (8th Cir. 2025) (citation modified).  As already discussed, Shopek has not plausibly alleged a constitutional violation by any of the Individual Defendants or any of the other City employees with whom he discussed seeking review of his resignation. Accordingly, Shopek's Section 1983 claim against the City is dismissed.

## III.    FMLA Claims

The FMLA provides that an "eligible employee"—such as one with "a serious health condition that makes the employee unable to perform the functions of the position of such employee"—"shall be entitled to a total of 12 workweeks of leave during any 12-month period."  29 U.S.C. § 2612(a)(1).  As relevant here, employers are prohibited from violating an employee's rights under the FMLA in two ways: (1) employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA (known as an interference claim); and (2) employers may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA (known as a retaliation claim).  *Id.* § 2615(a)(1)–(2).

For the reasons below, Shopek has not plausibly alleged either an interference or a retaliation claim under the FMLA.

### A.    Interference (Count IX)

To state a claim for FMLA interference, Shopek must allege: (1) he was an eligible employee; (2) the City was an employer as defined by the FMLA; (3) he was entitled to FMLA leave; (4) he gave the City notice of his intent to take FMLA leave; and (5) the City denied him FMLA benefits to which he was entitled.  *Brandt v. City of Cedar Falls*, 37

F.4th 470, 478 (8th Cir. 2022).  Shopek alleges that the City effectively denied him FMLA benefits in three ways: (1) Filigenzi required him to work while on FMLA leave; (2) he was "forced to take FMLA on many occasions"; and (3) he was "put on a continuous leave utilizing his FMLA time" in August 2023.  ECF No. 49 ¶¶ 291–93.  None of these allegations establishes a plausible claim for FMLA interference.

First, there are no plausible allegations that Filigenzi required Shopek to work while he was on FMLA leave.  Shopek's allegation appears to be related to an email he received from Filigenzi in June 2023, *see id.* ¶ 106, in which Filigenzi told Shopek:

> I understand that you have been taking intermittent FMLA days, which is your right and I fully support your need for medical leave.  However, it is important to emphasize that these absences do not excuse you from your responsibilities as the supervisor of the team.  As a leader, it is crucial that you demonstrate accountability and ensure that tasks are completed in a timely manner.  I would like to discuss with you your plan for completing these overdue items and how we can prevent future delays.

ECF No. 50-22.  Far from denying Shopek's right to use FMLA leave, Filigenzi expressly stated that she *supported* Shopek's use of FMLA.  *Id.*  Filigenzi's message cannot reasonably be read as demanding that Shopek personally complete work while he was on FMLA leave.  She merely noted that if Shopek needed to take FMLA leave, he needed to establish a plan to ensure the work for which he was responsible would be timely completed and offered to meet with him to discuss that plan.  *See id.*  Such conduct does not constitute FMLA interference.  *Cf. Hatchett*, 251 F.3d at 675 n.4 ("Even intermittent FMLA leave does not excuse an employee from the essential functions of the job.").

Second, separate from the City placing him on a short leave of absence in August 2023, there are no plausible allegations that anyone "forced" Shopek to take FMLA

leave.  Instead, on a substantial number of occasions, he *chose* to use FMLA leave to avoid being in the office with Filigenzi.  *See, e.g.*, ECF No. 49 ¶¶ 87, 91, 93, 98, 105, 110, 113, 116, 118, 123, 130, 133.  And when the City placed Shopek on a continuous leave of absence, it was because he had demonstrated that he was unable to work on site if Filigenzi was present, meaning he could not fulfill the essential functions of his job.  *See* ECF No. 51-13 at 1; *see also* ECF No. 50-21 at 1 (Odom writing that the "nature of [Shopek's] position" required his "physical presence in the workplace to fulfill [his] essential job functions").  That also does not constitute FMLA interference.  *Scruggs*, 817 F.3d at 1095 (holding an employer "did not violate FMLA by placing [an employee] on consecutive rather than intermittent leave" because the employee "was unable to perform an essential function of her job").

For these reasons, Shopek has not stated a plausible claim for FMLA interference.  Accordingly, his FMLA interference claim is dismissed.

### B.    Retaliation (Count X)

To establish a claim of retaliation under the FMLA, Shopek must show: (1) he engaged in activity protected by the FMLA; (2) he suffered a materially adverse employment action; and (3) a causal connection exists between his protected activity and the adverse employment action.  *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012).  In other words, Shopek "must prove that his exercise of FMLA rights played a part" in any adverse action taken by the City against him.  *Id.* (internal quotation marks omitted) (citation omitted).

Shopek alleges that Defendants retaliated against him for taking intermittent FMLA leave by "not allow[ing] [him] to interact with his team or attend regular meetings" upon his expected return from his continuous leave of absence in September 2023, "failed to reinstate [him] to his position properly," and used complaints from members of his team "about issues with his leadership" to "push their agenda of separating Shopek from his employment with the City." ECF No. 49 ¶¶ 294–300. Shopek acknowledges, however, that members of his team did, in fact, approach Defendants with concerns about his leadership. *See id.* ¶ 296. Shopek's conclusory allegations that those concerns related specifically to his use of FMLA are insufficient to state a plausible claim. *See Pulczinski*, 691 F.3d at 1007; *Iqbal*, 556 U.S. at 681 (holding that conclusory allegations are "not entitled to be assumed true").

Further, within one week of placing Shopek on his leave of absence in August 2023—well before he exhausted his FMLA entitlement—the City offered for Shopek to return to work contingent upon him meeting in person with Cameron first. ECF No. 49 ¶ 151. Shopek refused to meet with Cameron in person and, again, chose to continue taking FMLA leave because the accommodations the City offered were not the ones he preferred. *See id.* ¶¶ 152, 154–55, 157–59. Shopek acknowledged in an email to Xiong sent September 12, 2023, that his FMLA entitlement would be exhausted that week and requested approval for additional FMLA leave. ECF No. 50-35 at 1. Xiong denied Shopek's request for additional leave and informed him that he was expected to return to work in person on September 18, 2023. ECF No. 51-19 at 3; *see Scruggs*, 817 F.3d at 1093 ("The FMLA only entitles an employee to twelve weeks of leave per year; it does not entitle

an employee to extended leave once the twelve weeks has been used."). But Shopek "called out sick" that day instead. ECF No. 49 ¶ 165. Consistent with the City's Civil Service Rules, Shopek was deemed to have resigned his position. *See id.* ¶ 167; ECF No. 50-46. There is no plausible or reasonable inference to be drawn from Shopek's pleadings and exhibits that his use of FMLA leave, rather than his choice not to return to work as instructed upon exhausting his FMLA entitlement, was the cause for his separation from employment. *See Scruggs*, 817 F.3d at 1095.

Accordingly, the Court finds that Shopek has not plausibly alleged an FMLA retaliation claim, so his claim is dismissed.

## IV.    Remaining State-Law Claims

The remainder of Shopek's claims arise under Minnesota law. *See* ECF No. 49 ¶¶ 258–68 (disability discrimination under the MHRA, Count V); *id.* ¶¶ 269–78 (retaliation under the MHRA, Count VI); *id.* ¶¶ 279–82 (wrongful discharge, Count VII); *id.* ¶¶ 302–10 (IIED, Count XI); *id.* ¶ 311 (failure to update personnel record under the MGDPA, Count XII). This raises the question whether this Court should exercise jurisdiction over those claims.

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Minnesota ex rel. Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 708 (8th Cir. 2023) (quoting *Gunn v. Minton*, 586 U.S. 251, 256 (2013)). The Court has original jurisdiction over Shopek's ADA, Section 1983, and FMLA claims because they arise under federal law. *See* 28 U.S.C. § 1331. As noted, however, Shopek's MHRA, wrongful discharge, IIED, and MGDPA claims arise under Minnesota law. The

Court therefore may only hear those claims pursuant to 28 U.S.C. § 1367(a), which authorizes a federal court to exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." When a federal court has dismissed all claims within its original jurisdiction, however, "it is appropriate for [the] court to decline to exercise supplemental jurisdiction over" the remaining claims. *Steffen v. St. Paul Eye Clinic, P.A.*, 652 F. Supp. 3d 1029, 1042 (D. Minn. 2023) (citing *Glorvigen v. Cirrus Design Corp.*, 581 F. 3d 737, 749 (8th Cir. 2009)); *see Barstad v. Murray County*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." (alteration in original)); *see also* 28 U.S.C. § 1367(c)(3).

Here, the Court dismisses all of Shopek's claims within its original jurisdiction well before trial, *Barstad*, 420 F.3d at 888, and the "resolution of the remaining claims depends solely on a determination of state law," *Glorvigen*, 581 F.3d at 749. Therefore, the Court, in its discretion, declines to exercise supplemental jurisdiction over Shopek's remaining state-law claims and dismisses them "so that [they] may be considered, if at all, by the courts of Minnesota." *Hervey v. County of Koochiching*, 527 F.3d 711, 726 (8th Cir. 2008); *see Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").

36

## CONCLUSION

As set forth above, Shopek has not stated a plausible basis for relief on any of his claims.  Accordingly, based on the foregoing, and on all the files, records, and proceedings in this matter, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss (ECF No. 54) is **GRANTED** as to Shopek's federal-law claims;

2. Shopek's federal-law claims (Counts I–IV, VIII–X) are **DISMISSED** for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6);

3. Defendants' Motion to Dismiss (ECF No. 54) is **DENIED** as moot as to Shopek's state-law claims; and

4. Shopek's state-law claims (Counts V–VII, XI–XII) are **DISMISSED** because the Court declines to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3).

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 1, 2025

*s/Laura M. Provinzino*
Laura M. Provinzino
United States District Judge